## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

                            Plaintiff,

    v.

**THE PROCTER & GAMBLE COMPANY**
1 Procter & Gamble Plaza,
Cincinnati, OH 45202

      And

**BILLIE, INC.**
100 Crosby Street, Suite 301
New York, NY 10012

                       Defendants.

Civil Action No. 1:20-cv-03593 (ABJ)

**FILED UNDER SEAL**

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION PURSUANT TO
## SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT

> *We need to stop this before it becomes too big.*
> --P&G's SVP for North America Grooming discussing Billie

For many years, Procter & Gamble ("P&G") and Edgewell Personal Care Company ("Edgewell") dominated the razor industry through their respective Gillette and Schick brands. P&G was the market leader and remains so today. P&G markets its razors to women under the Gillette Venus brand and others.

In late 2017, Billie, Inc. ("Billie") launched an online only, direct-to-consumer challenge to P&G's women's razor dominance. Among other things, Billie charged a low price, employed savvy marketing designed to draw attention to the "pink tax"—that is, the practice of charging a

premium for razors marketed to women that are substantially similar to razors marketed to men—and positioned the Billie product as "anti-Venus."

Two years later, Billie had grown substantially and at P&G's expense.  P&G now seeks to acquire Billie on the eve of Billie's expansion into brick-and-mortar retail.  As P&G's CEO for Grooming observed, the "big" value from this acquisition to P&G is the "removal of the competitive threat."  The removal of Billie as an independent competitor eliminates important and growing head-to-head competition between P&G and Billie, and is likely to harm consumers through higher prices, among other harms.  The Proposed Acquisition should be temporarily restrained and preliminarily enjoined to permit the Commission time to adjudicate the legality of the Proposed Acquisition on its merits.

*       *       *

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining defendants The Procter & Gamble Company and Billie, Inc., including their agents, divisions, parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating their proposed acquisition (the "Proposed Acquisition").  Plaintiff seeks this provisional relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b).  Absent such provisional relief, P&G and Billie (together, "Defendants") would be free to consummate the Proposed Acquisition after 11:59 p.m. EST on December 17, 2020.

Preliminary relief is necessary to maintain the status quo and prevent harm to competition while the Commission conducts an administrative proceeding on the merits.  The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton

Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on December 8, 2020.  Pursuant to FTC regulations, the administrative proceeding on the merits is scheduled to begin on June 22, 2021 and will provide a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony. *See* 16 C.F.R. § 3.41 (2014).  This administrative proceeding will thoroughly evaluate the competitive effects of the Proposed Acquisition.

## NATURE OF THE CASE

1.      This is an action to temporarily restrain and preliminarily enjoin the consummation of P&G's anticompetitive acquisition of Billie (the "Proposed Acquisition").  If consummated, the Proposed Acquisition would allow the market-leading supplier of women's and men's wet shave razors to acquire an important competitor and eliminate growing competition that has benefitted consumers.

2.      P&G is the market leader in the sale of women's and men's wet shave razors.  Wet shave razors require the use of water and, typically, a shave prep product such as shaving cream, shave gel, or shave soap.  Nearly all wet shave razors are system or disposable razors.  System razors consist of a reusable handle and a detachable razor cartridge that a consumer can replace with refill cartridges.  Disposable razors comprise a handle with permanently affixed blades that consumers throw away after use.

3.      Launched in 2017, and backed by venture capital firms including Goldman Sachs and celebrity investors Venus and Serena Williams, Billie is a fast-growing online company that sells a mid-tier women's system razor.  Billie built its brand by finding an underserved customer base of Generation Z and Millennial women.  Billie won their business by, among other things, offering a low price and attacking the incumbents' perceived practice of

charging a pink tax for women's razors.  Billie also emphasized a "female-first" message.  Billie

challenged traditional portrayals of women's razors.  Billie became the first brand to use

advertisements that normalized female body hair, which many saw as a critique of P&G Venus's

advertising.  Billie targeted P&G from the start, with a vision to "[d]ethrone Gillette Venus to

become the number one women's razor brand in the U.S."  Billie's objective was to shake up the

women's shaving category, and even P&G recognized Billie as "anti-Venus."

4.     The Proposed Acquisition is likely to result in significant harm by eliminating

competition between the market leader and an important and growing head-to-head competitor.

The Proposed Acquisition arrests Billie's progress as it was on the cusp of expanding into brick-

and-mortar retail stores, which would have greatly heightened the already fierce competition

between P&G and Billie.

5.     P&G's CEO of Grooming viewed the "big" value from this acquisition as the

"removal of the competitive threat."  P&G's Senior Vice President of Grooming in North

America encouraged others to "think of" the value created by acquiring Billie in terms of the

"reduction of the competitive threat."

6.     The Proposed Acquisition would significantly increase concentration in relevant

antitrust markets that are already highly concentrated today.  As a result, the Proposed

Acquisition is presumptively anticompetitive.  Current market share statistics and concentration

measures understate Billie's future competitive significance, however, because Billie is a fast-

growing brand that would grow even faster after its expansion into brick-and-mortar retail.

7.     Defendants cannot show that the Proposed Acquisition will induce new entry or

repositioning by existing razor suppliers that would be timely, likely, or sufficient to counteract

the anticompetitive effects of the Proposed Acquisition.  Billie's first-mover advantage targeting

Millennial and Gen Z women online, the high costs of and challenges inherent in establishing a razor brand, the rising costs of online advertising, and the now crowded space at brick-and-mortar retailers (due to P&G's launch of Joy, Harry's launch of Flamingo, and Billie's likely addition to ██████████ ), among other things, combine to make entry or repositioning in response to the merger unlikely.

8.     Defendants cannot show cognizable, merger-specific efficiencies that would offset the likely and substantial competitive harm resulting from the Proposed Acquisition.

9.     On December 8, 2020, by a 4-1 vote, the Commission found reason to believe that (1) the acquisition agreement constitutes an unfair method of competition in violation of Section 5 of the FTC Act and (2) the acquisition would violate Section 7 of the Clayton Act and Section 5 of the FTC Act because the acquisition may substantially lessen competition and/or tend to create a monopoly in one or more lines of commerce.  The Commission issued its administrative complaint on that same day.

10.     Defendants have stipulated to the Court's entry of a temporary restraining order preventing Defendants from consummating the Proposed Acquisition until the fifth business day after the Court rules on the Commission's motion for a preliminary injunction or until after the date set by the District Court, whichever is later.  Such a temporary restraining order is necessary to preserve the status quo and to protect competition while the Court considers the Commission's application for a preliminary injunction.

11.     Preliminary injunctive relief is similarly necessary to preserve the status quo and to protect competition during the Commission's ongoing administrative proceeding.  Allowing the Proposed Acquisition to proceed while the Commission is assessing whether the Proposed Acquisition would harm competition and would undermine the Commission's ability to remedy

the anticompetitive effects of the Proposed Acquisition if it is found unlawful after a full

administrative trial on the merits and any subsequent appeals.

## JURISDICTION AND VENUE

12.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C.

§ 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under the

Acts of Congress protecting trade and commerce against restraints and monopolies, and is

brought by an agency of the United States authorized by an Act of Congress to bring this action.

13.     Section 13(b) of the FTC Act, 15 U.S.C. §53(b), provides in pertinent part:

Whenever the Commission has reason to believe –

(1) that any person, partnership, or corporation is violating, or is about to
violate, any provision of law enforced by the Federal Trade
Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the
Commission and until such complaint is dismissed by the Commission
or set aside by the court on review, or until the order of the
Commission made thereon has become final, would be in the interest
of the public – the Commission by any of its attorneys designated by it
for such purpose may bring suit in a district of the United States to
enjoin any such act or practice.  Upon a proper showing that weighing
the equities and considering the Commission's likelihood of ultimate
success, such action would be in the public interest, and after notice to
the defendant, a temporary restraining order or a preliminary
injunction may be granted without bond . . . .

14.     Defendants are, and at all relevant times have been, engaged in activities in or

affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of

the Clayton Act, 15 U.S.C. § 12.

15.     The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and

personal jurisdiction exists where service can be effected pursuant to a federal statute.  Fed R.

Civ. P. 4(k)(1)(C).  Defendants are therefore subject to personal jurisdiction in the District of

Columbia, and they have expressly consented to such personal jurisdiction in this case.  Venue is

proper in the District of Columbia under 15 U.S.C. §§ 22 and 53(b) and 28 U.S.C. § 1391(b) and

(c), as both P&G and Billie transact business in the District of Columbia.

### THE PARTIES AND THE PROPOSED ACQUISITION

16.     Plaintiff the Federal Trade Commission is an administrative agency of the United

States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C.

§§ 41 *et seq*., with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C.

20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*,

Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

17.     P&G is a publicly held company, headquartered in Cincinnati, Ohio, that

specializes in the manufacture and sale of consumer goods.  P&G generated net sales across all

business units of approximately $71 billion for the fiscal year ending June 30, 2020.  P&G

manufactures, produces, and sells a variety of razors and shave products online and in brick-and-

mortar retail, under brands that include Gillette, Venus, Joy, Braun, Bevel, and The Art of

Shaving.  P&G generated approximately $6 billion in FY 2020 net sales from its Global

Grooming business unit, which encompasses most of its razors and ancillary products.  From

January 2020 to March 2020, P&G generated approximately ████████ in revenue in wet

shave products, ████████ of which was attributable to women's wet shave razors.

18.     Billie, Inc. ("Billie") is a privately held company based in New York, New York,

that sells a five-blade wet shave systems razor through its DTC platform under the Billie brand.

████████████████████████████████████████████████

██████████████████████.  Billie also sells shave cream, body wash, lotion, lip

balm, dry shampoo, and facial wipes.  Billie's 2019 sales of women's system razors accounted

for ████████████████ in net sales. ██████████████████████

██████████████████████.

19.     Pursuant to an agreement between Defendants and Commission staff, unless temporarily restrained and preliminarily enjoined by this Court, Defendants would be free to consummate the Proposed Acquisition after 11:59 p.m. on December 17, 2020.

20.     In authorizing the filing of this complaint, the Commission determined that (i) it has reason to believe the Proposed Acquisition would violate the Clayton Act and the FTC Act by substantially lessening competition in one or more lines of commerce, and (ii) an injunction of the Proposed Acquisition pending the resolution of the Commission's administrative proceedings and any appeals will promote the public interest, so as to minimize the potential harm to customers and preserve the Commission's ability to order an adequate remedy if it concludes, after the administrative proceeding, that the Proposed Acquisition is unlawful.

## RELEVANT MARKETS

21.     A relevant market in which to evaluate the effects of the Proposed Acquisition is no broader than production and sale of wet shave system razors and disposable razors ("wet shave razors") sold in the United States.

22.     It is also appropriate to analyze the effects of the Proposed Acquisition in at least two narrower relevant markets within the wet shave razor market: (1) the market for the production and sale of women's wet shave razors in the United States and (2) the market for the production and sale of wet shave system razors in the United States.

23.     If the Proposed Acquisition produces anticompetitive effects in any relevant market, then it is unlawful under the Clayton Act and the FTC Act.

A.   **Relevant Product Markets**

24.   The relevant product market is no broader than the production and sale of wet shave razors, which includes system and disposable razors. ███████████████████████ ███████████████████████████████████████████ that is, customers purchase razors both online and in brick and mortar retail stores.

25.   System razors consist of a reusable handle and a detachable razor cartridge. Consumers typically replace the razor cartridge with refill cartridges sold by the same manufacturer without the need to replace the handle.

26.   Disposable razors comprise a single assembly of handle with permanently affixed blade(s).  Consumers discard disposable razors after they finish using them.

27.   Other forms of hair removal, such as electric (or "dry") shaving razors and alternative hair removal products (*e.g.*, hair removal creams or waxes) are not close substitutes for wet shave razors.  Industry participants and Defendants recognize that wet shave razors are distinct from dry shave razors and alternative hair removal products and sell these products at distinct price points to distinct consumers.

28.   Customers would not switch from wet shave razors to dry shave razors or alternative hair removal products in sufficient numbers to defeat a small but significant non-transitory increase in price ("SSNIP") by a hypothetical monopolist of wet shave razors.

29.   The Proposed Acquisition would produce anticompetitive effects within at least two narrower relevant markets, in addition to producing anticompetitive effects in the broader wet shave razor market.  The Proposed Acquisition would harm competition in narrower relevant markets for the production and sale of: (i) women's wet shave razors and (ii) system razors (including both women's and men's).

30.     Industry participants recognize narrower product markets divided along gender lines (women's or men's) and by product type (system or disposable).  Industry participants recognize each segment as distinct from others and conduct their business accordingly.

31.     In each of these narrower relevant markets, a hypothetical monopolist could profitably impose a SSNIP on purchasers of the relevant product.

**B.     Relevant Geographic Market**

32.     The relevant geographic market in which to analyze the Proposed Acquisition is no broader than the United States.  Razor suppliers negotiate distinct terms of sale with customers for different countries and, in some cases, offer distinct product assortments in different countries.  Defendants and other industry participants generally do not make granular or distinctive purchasing or sale decisions for smaller regions within the United States.

33.     A hypothetical monopolist of wet shave razors in the United States profitably could impose a SSNIP on U.S. customers.  Customers based in the United States cannot defeat a price increase in the United States via arbitrage or substitution.

**MARKET PARTICIPANTS**

34.     P&G is the leading manufacturer of branded systems razors globally and in the United States.  P&G is also a major producer of disposable razors.  P&G's razor brands include the Gillette family (including the Joy and Venus women's razor brands), Braun, Bevel, and The Art of Shaving.   P&G holds a dominant market position in the sale of wet shave razors, accounting for more than ▮▮▮ of sales by revenue in some relevant markets.  P&G manufactures its own blades and cartridges for its wet shave razor brands.

35.     Billie is a fast-growing, digitally-native company that began selling a five-blade women's system razor in November 2017.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████████████

████████████

36.     Edgewell is a consumer products company that sells a full line of system and disposable razors marketed separately to men and women.  Edgewell owns over 25 established brand names, including razor brands Schick and Personna/American Safety Razor.  Edgewell also sells private label wet shave products and components in North America through its Private Brands Group to retailers and non-integrated razor companies███████████

37.     Société BiC ("BiC") manufactures and sells consumer products including disposable lighters, pens, and razors.  ████████ of BiC's wet shave razor sales in the United States are men's and women's disposable razors, although BiC also sells a system razor.  ███

████████████████████████████████████████████

38.     Harry's Inc. ("Harry's") manufactures and sells five-blade men's and women's system razors.  Harry's sells its men's system razor under the Harry's brand and its women's system razor under the Flamingo brand.  The vast majority of Harry's branded razor sales are made under the Harry's brand. ███████████████████████████████████

████████████.  Harry's does not manufacture or sell disposable razors.

39.     Dollar Shave Club, Inc. ("Dollar Shave Club"), now owned by Unilever plc/Unilever N.V. ("Unilever"), sells system razors purchased predominantly by men.  Dollar Shave Club does not manufacture or sell disposable razors.

**THE PROPOSED ACQUISITION IS PRESUMPTIVELY ILLEGAL**

40.     The Proposed Acquisition would lead to significant increases in concentration in already highly concentrated markets for wet shave razors and in narrower relevant markets.

41.     Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-acquisition market concentration level above 2500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in HHI of more than 200 points renders an acquisition presumptively unlawful. Transactions resulting in highly concentrated markets—markets with an HHI above 2500 points—with an HHI increase of more than 100 points potentially raise significant competitive concerns and warrant scrutiny.  The HHI is calculated by totaling the squares of the market shares of every firm in the relevant market.

42.     The market for the production and sale of wet shave razors in the United States is already highly concentrated, with an HHI of over 3000.  The Proposed Acquisition increases the concentration by more than 125 points and therefore potentially raises significant competitive concerns and warrants scrutiny.

43.     The market for the production and sale of women's wet shave razors in the United States is already highly concentrated, with an HHI of more than 2500.  The Proposed Acquisition increases the concentration in this market by more than 300 points and is therefore presumptively illegal.

44.     The market for the production and sale of women's and men's wet shave system razors in the United States is already highly concentrated, with an HHI of over 4000.  The Proposed Acquisition increases the concentration in this market by more than 200 points and is therefore presumptively illegal.

45.     Changes in HHI based on current market shares understate the competitive significance of the Proposed Acquisition because Billie is rapidly growing.  Billie was about to

expand its sales into additional channels, particularly brick-and-mortar retail, before the Proposed Acquisition arrested its progress.

## THE PROPOSED ACQUISITION IS LIKELY TO RESULT IN ANTICOMPETITIVE EFFECTS

46.      In each of the relevant markets, the Proposed Acquisition would eliminate substantial and growing head-to-head competition between P&G and Billie, likely leading to higher prices and other harm for consumers.

47.      P&G has long been the market leader in sales of women's and men's wet shave system razors.  Billie saw an opportunity to attack P&G's position and shake up the category by entering the market positioned as an "anti-Venus" razor fighting the practice of charging women a "pink tax."

### A.      Billie Competes Aggressively Against P&G Today

48.      In November 2017, Billie began selling a $9 woman's system razor through an online direct-to-consumer ("DTC") platform.  Billie targeted Generation Z and Millennial women as customers, with "female first" messaging that challenged traditional marketing approaches to women's razors.

49.      Billie successfully built its brand through marketing campaigns focused on fighting the pink tax and normalizing body hair on women.  As Billie's website explains, "[w]e noticed that women were overpaying for razors and shamed for having body hair.  Kind of a double whammy, when you think about it.  So, we did away with the Pink Tax and put body hair on the big screen."

50.      Billie grew from ██████ in net sales in 2017 to ██████ in net sales in 2018. Billie's growth caught P&G's attention, especially after Harry's and Dollar Shave Club's recent

disruption of P&G's stable market leadership in men's wet shave razors.[1]  A mid-2018 draft

memorandum discussing █████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

     51.     By August 2018, P&G set up a women's system razor DTC business, called

Venus Direct, as a competitive response to Billie.  Venus Direct offered customers a subscription

service featuring the same line-up of Venus razors available in brick-and-mortar stores.

     52.     P&G's new DTC business did not stop Billie's growth.  ███████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

     53.     From the start, Billie positioned its product to attack P&G's Gillette Venus

product.  Billie told its initial investors that its goal was to "Dethrone Gillette Venus."  P&G

noted the attack:  "Billie has positioned itself as notably 'anti-Venus,' with negative references to

portraying women as 'a goddess just for shaving.'"

     54.     P&G, for its part, was "being proactively paranoid," according to its CEO of

Grooming.  In addition to its DTC offering, in March 2019, P&G launched its Joy razor

exclusively with Walmart.  Joy became part of P&G's plan to offer a youthful-oriented mid-tier

female razor, much like Billie.  ████████████████████████████████████████, P&G launched

Joy quickly as an online DTC brand ██████████████████.

---

[1] *See In the Matter of Edgewell Personal Care Company and Harry's, Inc.*, FTC Docket No. 9390,
Complaint (Filed Feb. 3, 2020) (describing disruption by Harry's and Dollar Shave Club in men's razors).

55.      Joy and Billie target a similar age group.  P&G hoped that they could get

Generation Z and Millennial women to join the Joy family before Billie (or Flamingo) could sign

them up.

56.      Joy's branding has a number of resemblances to the Billie product.  Upon seeing

the Joy razor, Billie's cofounder wrote that Joy "just ripped off a bunch of our stuff," even "the

tile choice of the bathroom."  Industry observers likewise recognize that Joy and Billie are close

competitors.

57.      P&G considered Billie's vocal stance on the "pink tax" and Billie's pricing before

setting Joy's suggested retail price, among other factors.  In response to Joy's launch, Billie's

cofounder guessed that Joy ███████████████████████████

58.      Joy was priced at $8.97 at Walmart (Joy prices at other locations vary).  Billie

prices its razor at $9.

**B.      The Proposed Acquisition Halted Billie's Expansion Into Brick-And-Mortar
Retail, Which Would Have Increased Competition Between P&G And Billie**

59.      Billie was poised to expand into brick-and-mortar ████████████████████

prior to the P&G deal.

60.      Billie and ████████████████████████, understood that Billie needed to

transition from a DTC-only brand to one that is available at brick-and-mortar retailers as well.

████████████ believed that expanding into brick-and-mortar stores would help Billie achieve

profitability.  ██████████████████████████████████████

███████████████████████████████████████████████████

████████████████

61.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

62.   P&G worried about Billie's expansion into retail and took steps with retailers with

the hope of delaying or blocking Billie's expansion.   ████████████████████████

████████████████████████████████████████████████████

████████████████████

63.   Nevertheless, Billie was close to completing negotiations to expand into retail

before the Proposed Acquisition abruptly halted its talks.   ██████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████

64.   ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████ ████████████████████

███████████████████████████████████████████████

████████████████████████

65.   ██████████████████████████████████████

████████████████████████████.   If Billie were to resume those negotiations, there is

no reason to doubt that Billie would successfully conclude its negotiations to expand into brick-

and-mortar retail stores.   ██████████████████████████████████

████████████████████████████████████████████████. Regardless of the

Proposed Acquisition, Billie will successfully expand into brick and mortar retail.

66.     If Billie expands into brick-and-mortar retail, it will do so at P&G's (and others')

expense.  Regardless of which retailer or retailers agree to carry Billie, Billie is likely to take

significant sales and shelf space from P&G.  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

67.     P&G's senior grooming executives recognize the heightened competition that

would follow Billie's expansion into brick-and-mortar retail.  They viewed preventing Billie's

retail expansion—in a posture where Billie was a competitor to P&G—as a primary motivation

for pursuing the Proposed Acquisition.

68.     In mid-2019, P&G Senior Vice President of Grooming provided a list of ways in

which P&G would "create value from this [the purchase of Billie]."  He included on his list the

"reduction of the competitive threat."  P&G's CEO of Grooming responded to the list:  "The big

one is removal of the competitive threat."  A P&G analyst observed that the proposed transaction

would remove a significant disruptor from the market:  "This is big news!"

69.     ████████████████████████████████████████

████████████████████████████████████

### LACK OF COUNTERVAILING FACTORS

70.     Defendants cannot demonstrate that new entry or expansion by existing firms

would be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition.

71.     Operating a successful DTC business requires a product or service that is

delivering an unmet need in a category.  Among other things, Billie enjoyed a first-mover

advantage that led to success in the DTC channel, which, in turn, led to interest from brick-and-mortar retailers that a new entrant could not easily replicate.  Billie identified and exploited a previously unsatisfied consumer need for a mid-tier women's system razor appealing to Generation Z and Millennial women.  Billie earned its loyal customer base and reputation through its marketing campaigns against P&G and other incumbents' practice of charging a pink tax, among other things.

72.     In the words of one of Billie's co-founders: "it's harder to enter into the market as a second mover."  Any new entrant will find it difficult to secure a sufficient return on investment because Billie already secured the most readily available DTC online customers.  Attracting new online customers will now require higher advertising spend.  A new entrant is unlikely to be able to enter through retailers because retailers are typically not interested in carrying a razor supplier that has not previously shown an ability to secure sales online.  A new entrant is also unlikely to be able to enter as an online DTC brand to pave a path to retailers as did Harry's and Billie because of the high cost of online advertising and Billie's first-mover advantage.

73.     In addition, the costs of online advertising are increasing significantly year over year.  Any new DTC entrant would face higher costs than Billie did.  These growing costs are a stronger entry barrier than Billie faced.

74.     The failure of current "second movers" to replicate Billie's significance in the woman's razor space confirms that successful new entry or repositioning is unlikely.  No DTC company has been able to replicate Billie's online success to date.  Established razor manufacturers Harry's and P&G followed Billie's successful online launch with launches of women's system razors at similar price points (Flamingo and Joy, respectively).  Despite backing

from established razor companies and access to mass retailers, these products have lagged behind Billie in market share and sales. The space is now crowded, further impeding entry or repositioning in response to the anticompetitive effect of the acquisition.

75. Defendants cannot demonstrate cognizable and merger-specific efficiencies that would be sufficient to rebut the presumption and evidence of the Proposed Acquisition's likely anticompetitive effects.

76. Defendants also cannot demonstrate that Billie's business will fail and that its assets will exit the market absent the proposed acquisition.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

77. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the Proposed Acquisition until the Commission has had an opportunity to adjudicate the Proposed Acquisition's legality in an administrative proceeding. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.

78. The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C. § 45 and that the acquisition agreement violates Section 5 of the FTC Act. In particular, the Commission is likely to succeed in demonstrating, among other things, that:

a. The Proposed Acquisition would have anticompetitive effects in the United States, in a relevant product market no broader than the production and sale of wet shave system razors and disposables;

b. The Proposed Acquisition would have anticompetitive effects in the United States, in a relevant product market consisting of the production and sale of women's wet shave razors;

c. The Proposed Acquisition would have anticompetitive effects in the United States, in a relevant product market consisting of the production and sale of wet shave system razors in the United States.

79.     Preliminary relief is warranted and necessary.  In the absence of preliminary relief, should the Commission rule that the Proposed Acquisition is unlawful after the full administrative trial, reestablishing vigorous competition between P&G and Billie would be difficult, if not impossible, if the Proposed Acquisition has already occurred.  Moreover, without relief from this Court, substantial harm to competition would likely occur in the interim, even if a suitable divestiture remedy were obtained later.

80.     Accordingly, the equitable relief requested here is in the public interest.

Wherefore, Plaintiff respectfully requests that this Court:

a. Temporarily restrain Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly, pending a hearing on the Commission's application for a preliminary injunction under Section 13(b);

b. Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly, pending a full administrative hearing;

c. Retain jurisdiction and maintain the status quo until the administrative proceeding that the Commission has initiated is concluded; and

d. Award such other and further relief as the Court may determine as appropriate, just, and proper.

Dated: December 9, 2020

Of counsel:

IAN R. CONNER
(D.C. Bar 979696)
Director
Federal Trade Commission
Bureau of Competition

DANIEL FRANCIS
(D.C. Bar 1004918)
Deputy Director
Federal Trade Commission
Bureau of Competition

PETER RICHMAN
(CA Bar 149107)
Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers III Division

BRIAN TELPNER
(D.C. Bar 462812)
Deputy Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers III Division

GRETA BURKHOLDER (D.C. Bar
1004405)
KEITHA CLOPPER (D.C. Bar 486423)
CLARKE T. EDWARDS (D.C. Bar
1011154)
MEGAN HENRY (NY Bar 5539671)
MARC W. SCHNEIDER (FL Bar 0712906)
Attorneys
Federal Trade Commission
Bureau of Competition
Mergers III Division

Respectfully Submitted,

JONATHAN H. LASKEN
(D.C. Bar 997251)
Senior Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, D.C. 20580
Telephone: (202) 326-2064
Email: jlasken@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*